J-S77001-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF: Q. R. M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D. R. H., JR., NATURAL FATHER | No. 1186 MDA 2017 |

Appeal from the Decree Entered June 27, 2017
In the Court of Common Pleas of Franklin County
Orphans' Court at No(s): 29 ADOPT-2017

BEFORE: BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JANUARY 17, 2018**

D.R.H. ("Father") appeals from the decree entered on June 27, 2017, that granted the petition filed by the Franklin County Children and Youth Services ("the Agency") to involuntarily terminate his parental rights to his minor son, Q.R.M. ("Child") (born in August of 2006), pursuant to sections 2511(a)(1), (2), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1] We affirm.

The orphans' court issued the following relevant findings of fact in support of its termination of Father's parental rights:

a. [Child] was emergency placed in the temporary legal and physical custody of the Agency with placement in foster care provided by Northwestern Human Services Franklin/Fulton

---

[*] Former Justice specially assigned to the Superior Court.

[1] B.L.K. ("Mother") was not named on the Agency's petition and is not a party to the current appeal.

(hereinafter, "NHS") on March 15, 2016, and has remained in the custody of the Agency since that date.

b. At the time of [Child's] placement, [Father] was incarcerated at SCI Mahoney in Frackville, Pennsylvania.

c. An Adjudication and Disposition Hearing was held on March 31, 2016. [Child] was adjudicated dependent and ordered to remain in the legal and physical custody of the Agency.

d. As a result [of] [Child's] adjudication as dependent, [Father] was ordered to participate in a parental fitness assessment[,] including a psychological evaluation to assess his parental abilities for the [c]ourt to make a determination regarding reunification and to assist the [Agency] to plan for any additional services, obtain and maintain stable housing, obtain and maintain employment and/or financial stability to provide for his son's needs, comply with the terms of his criminal sentence and refrain from further criminal activity, and participate in frequent and consistent visitation with [Child].

e. [Father] has remained incarcerated throughout [Child's] placement.

f. To date, [Father] has not participated in a parental fitness assessment or a psychological evaluation.

g. [Father] has been unable to obtain or maintain stable housing due to his incarceration.

h. [Father] has been unable to obtain or maintain employment and/or financial stability due to his incarceration.

i. [Father] has not followed the terms of his criminal sentence and refrained from further criminal activity in that he received at least one misconduct while incarcerated.

j. On December 8, 2016, the [A]gency spoke with [Father] regarding his status in jail. He reported that due to the fact he received a misconduct for fighting he will not go in front of the parole board until July of 2017.

k. [Father] has not participated in frequent and consistent visitation with [Child].

l.  Since approximately June 8, 2016, the Agency has attempted to arrange visits or contact between [Father] and [Child].

m. On July 13, 2016, the Agency reached out to SCI Mahaney to determine how visits are held. SCI Mahoney staff reported that their visitation is held in a large room with all the other visitors.

n.  [Child] is diagnosed with Disruptive Behavior Disorder, Post-traumatic Stress Disorder, Anxiety Disorder, Attention-Deficit/Hyperactivity Disorder, Combined Typed rule-out Reactive Attachment Disorder, and has had multiple mental health interventions.

o.  [Child] has never met his father and expresses that he is afraid of [him] because [Father] allegedly escaped the jail to come and get his mother while [Child] was in her belly. He acknowledges that [Father] is incarcerated and says he does not want to go anywhere near him.

p.  Due to the Agency's concerns that [Child] has never met [Father] and [Child's] mental health needs, SCI Mahoney staff stated that they would arrange to have a private room for them and contact the [A]gency when that is arranged.

q.  In July of 2016, due to continued concerns regarding [Child's] overall mental health and anxiety surrounding his father, the agency reached out to [Child's] mental health team in order to determine the best way to orchestrate visitation with [Father]. Dr. Nikita Eike with Momentum Services, his treating psychiatrist at the time, requested to have a conversation with [Father] prior to visitation occurring.

r.  In light of Dr. Eike's request, the Agency sent [Father] letters on July 22, 2016 and September 7, 2016, requesting that he reach out to Dr. Eike to discuss visitation.

s.  On December 20, 2016, the [A]gency also contacted his trauma based therapist, Renee Holoviak with Family Behavioral Resources (hereinafter, "FBR"), to assist in orchestrating healthy, non-traumatic contact between [Child] and [Father].

t.  On January 6, 2017, Ms. Holoviak provided a letter expressing concern about [Child's] mental health due to contact with his parents.

u. At Ms. Holoviak's suggestion, the [A]gency encouraged [Father] to send [Child] cards or letters with no heavy content until they got to know each other well.

v. On February 7, 2017, the [A]gency received a letter [Father] wrote to [Child] expressing his love and support for [Child]. He also wanted to share his side of events alleged by [Mother]. Due to concerns surrounding his mental health, the agency forwarded the letter to his therapist, who shares the information with him as it is deemed necessary and beneficial to him.

w. On February 3, 2017, Ms. Holoviak reported that she called the jail to schedule a telephone conference with [Father], but was unable to speak with [him] by phone unless he added [FBR] to his list of phone contacts, and then he would need to initiate phone contact with her.

x. [Father] participated in the Permanency Review Hearing on February 13, 2017, by telephone. The court informed [Father] that he needed to [] add [FBR] to his phone list.

y. On February 13, 2017, Ms. Holoviak mailed a letter to [Father] requesting that he add [FBR] to his phone contact list.

z. On May 3, 2017, Ms. Holoviak contacted the prison to determine if [Father] had added [FBR] to his telephone contact list. CSI staff indicated that their information is confidential and could not be disclosed.

aa. On May 3, 2017, Ms. Holoviak mailed another copy of the letter to [Father] requesting that he add her to his phone contact list.

bb. To date, Ms. Holoviak has not received a call from [Father] to discuss visits with [Child].

cc. [Father] has sent two letters to [Child]. The [A]gency had concerns with the content of the letters.

dd. [Child's] mental health has been negatively affected by even the mention of contact with [Father]. He has displayed behavioral outbursts surrounding hearings and discussions of [Father].

ee. At the Permanency Review Hearing on April 13, 2017, [Child] became visibly uncomfortable when there was discussion of putting his father on the phone for the court hearing. He grew very stiff and appeared to want to run out of the courtroom. He also refused to speak to his Guardian Ad Litem and the court.

ff. On April 14, 2017, [Child] was non-compliant and attacked staff. He was placed in multiple restraints.

gg. On April 15, 2017, [Child's] behavior declined rapidly. He began attacking staff and then, when placed in a room, he started collecting his urine and throwing it at staff. [Child] was taken to CRISIS and [Child] attacked staff on the way to the hospital and then attacked hospital security when they arrived. He was put in a room at the hospital and he stripped naked and started to masturbate. [Child] then put a finger in his anus and attempted to wipe feces on staff.

hh. From April 16, 2017 through April 29, 2017, [Child] was in-patient at Southwood Hospital in Pittsburgh.

ii. On April 28, 2017, with input from [Child's] therapeutic team, [a] child preparation worker, and attorney, determined that due to the connection to his father severely affecting his mental health, it would be in [Child's] best interest to sever the connection between [Child] and [Father].

jj. [Father] has not completed any of his court-ordered services and continues to be unavailable to parent his child, who has remained in the Agency's custody for over a year.

kk. It is in [Child's] best interests for [Father's] parental rights to be terminated.

Orphans' Court Decree ("OCD"), 6/27/17, at 2-5.

On June 7, 2017, the Agency filed a petition to involuntarily terminate Father's parental rights. On June 27, 2017, a hearing was held on that petition. Both Father and Mother appeared in person at the hearing, each

represented by their own court-appointed counsel.[2] Child's legal counsel also participated at the hearing. After hearing testimony from Father, Ms. Holoviak, and Elizabeth Johnston, an Agency case worker, the court issued a decree dated June 27, 2017, terminating Father's parental rights to Child pursuant to section 2511(a)(1), (2), and (b) of the Adoption Act.

On July 25, 2017, Father filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2) and (b). In his brief, Father alleges that the orphans' court's decision to terminate his parental rights was not supported by clear and convincing evidence and therefore constituted an abuse of discretion in that:

  a. Within the six months preceding the filing of the Petition, Father had requested visitation with Child and had sent notes to Child, thus not evidencing a settled purpose of relinquishing his parental claim to Child.

  b. Father will soon be released from incarceration and will only then have the opportunity to remedy the conditions that led to placement of Child and to fulfill the requirements set by the Agency for reunification.

OCO at 17. **See also** Father's Brief at 4.

We review an appeal from the termination of parental rights under the following standard:

---

[2] As the orphans' court noted in its opinion, "Mother's parental rights were not at issue at the time; however, the [c]ourt determined that if appropriate, it would renew a focus on Mother. The [c]ourt's primary concern was [Child's] safety and stability." Orphans' Court Opinion ("OCO"), 8/24/17, at 3 n.2.

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, … 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *In re: R.I.S.*, 36 A.3d [567,] 572 [(Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, … 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, … 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, … 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012).

In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re S.H.*, 879 A.2d 802, 806 (Pa. Super. 2005). We have previously stated:

- 7 -

The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003) (internal quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interest of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511; other citations omitted).

This Court must agree with only one subsection of 2511(a), in addition to section 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we review the decree pursuant to sections 2511(a)(2) and (b), which provide as follows:

**(a) General Rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

…

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the

- 9 -

contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008).

> Moreover, this Court has previously stated:
>
> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* Where a parent does not "exercise reasonable firmness in declining to yield to obstacles, his [parental] rights may be forfeited." *In re A.S.*, 11 A.3d 473, 481 (Pa. Super. 2010). With respect to the application of section 2511(a)(2) to an incarcerated parent, the Pennsylvania Supreme Court held:

> [I]ncarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

*S.P.*, 47 A.3d at 830.

Instantly, Father asserts that he was not afforded sufficient time to show that he could remedy the conditions that led to the removal of Child. More specifically, Father states that the Agency set various requirements and objectives for him to complete in order to achieve reunification with Child; however, Father was unable to complete these requirements while incarcerated. Father's Brief at 8, 12-13. Father further argues that he will soon be released from prison and that only then will he have the opportunity to remedy the conditions that led to Child's placement and to fulfill the requirements established by the Agency. *See id.* at 11-14. After careful review, we conclude Father's claim is without merit.

The orphans' court held that the Agency satisfied the statutory grounds for termination of Father's parental rights under section 2511(a)(2) by clear and convincing evidence. In support of its decision, the court opined:

> [T]his case is somewhat unusual in that Father and [Child] have absolutely no relationship, period. In fact, Father believed that [Child] was dead based on a letter he received in jail from Mother in 2009. He neither questioned Mother further nor engaged any family members to do so on his behalf. He took Mother at her word. Assuming Father's testimony credible on this point as there was no evidence to the contrary, from 2009 until 2016, Father did not know [Child] was alive, so he did not perform any parental duties on [Child's] behalf during that time.
>
> When the Agency contacted Father in March, 2016, he was incarcerated in state prison and remained so throughout the pendency of this case. He participated in the Juvenile Court's permanency review hearings via telephone and represented to the [c]ourt and the Agency that he wanted contact with [Child], yet did nothing on his end to facilitate that contact. Of course, we are not so callous or ignorant to hold Father to the same

- 11 -

standard in this regard as a parent whose liberty has not been restrained; however, there were steps he could have taken that he did not. He missed opportunities to work with the Agency, [Ms.] Holoviak, and Dr. Eike to attempt to arrange visits with [Child]. There was also no evidence that Father requested that either his counsel or the [*sic*] even the Juvenile Court assist him in making the necessary arrangements.

…

This [c]ourt takes very seriously the evidence that Father, knowing his son was in care and in need of his support, chose to engage in fighting behavior in the correctional facility which set back his parole by 13 months. This behavior is simply part of a larger course of criminal conduct for Father going back to [*sic*] prior to [Child's] birth. He knew Mother was pregnant with their child when he committed the offenses in January and April of 2006[,] resulting in a sentence of 3-15 years of incarceration. He was prohibited from having contact with Mother because of a criminal act against her. His history of misconducts while incarcerated has prevented earlier parole and return to the community. Father's lack of good judgment and respect for authority resulted in an extended period of incarceration and loss of valuable time working to create a relationship with his son.

While Father points out that he has a release date in September [of] 2017, he will [be] under the authority of the state parole board. He will have his own rules and obligations. It remains to be seen when or if Father will be in any position, within a reasonable time, to parent his child.

Most concerning to this [c]ourt is Father's complete failure to comprehend the severity of [Child's] mental and emotional instability. He seems to believe that if he can just tell his child the horrible things Mother did (lying to Father that the child was dead, lying to the child that Father beat him in utero), [Child] will forgive him and all will be well. The mental health professionals do not believe this to be the case. The solution is not so simple. [Ms.] Holoviak testified that Father is a significant trigger for [Child's] negative behaviors and decompensation. If there is to be any relationship ever, it will take far more than a simple explanation and a few months of work.

The mental health professionals have determined that [Child] is in need of a residential treatment facility to address his extreme mental health needs. It is just not logical to conclude

that, even if Father's release from jail is as imminent as September [of] 2017, the conditions that necessitate [Child's] placement can be remedied timely. The child's guardian ad litem ("GAL") and legal counsel, Attorney Ann Rotz[,] supported the Agency's request that Father's parental rights be terminated. As counsel, Attorney Rotz related [Child's] unequivocal desire to never see, communicate with, or hear from Father. As GAL, Attorney Rotz argued[:]

> We are dealing with a child who has exceptional mental health needs, who's been in placement for 15 months and for 15 months we have not been able to keep [Child] stable and safe. The mere mention of his father is a trigger that has caused a catastrophic reaction for him. It has resulted in him being taken to crisis. He has destroyed property. He has injured other people who he otherwise care [*sic*] about and had relationships with. We are in a situation where, unless [Child's] behaviors stabilize, we don't even have foster homes available for him. So, I do believe that we are dealing with an exceptional case in this circumstance.

> Attorney Rotz further argued, "… [Father] is not any closer today to being a resource for [Child] than he was when [Child] was originally placed.["]

OCO at 23-27 (citations to record omitted). After careful review, we conclude that the court's determinations regarding section 2511(a)(2) are supported by sufficient, competent evidence in the record, and we discern no abuse of discretion.

After we determine that the requirements of section 2511(a) are satisfied, we proceed to review whether the requirements of subsection (b) are met. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but the focus is on the child pursuant to section 2511(b). *Id.* at 1008.

- 13 -

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1992)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Here, the orphans' court concluded that it would be in Child's best interest for Father's parental rights to be terminated. The court expressed the following in support of its decision:

> Father and [Child] have never had a relationship. Not only has [Child] never met his father, he believes that his father tried to kill him and, as a result, wants no contact with Father in any form. Whether this belief is rational or based in fact is not relevant to the Agency's more immediate need to keep [Child] stable and safe. There is no parent/child bond in existence; therefore, there is no bond to sever.

> [Child's] counselor has opined that at this time, it is not possible for [Child] to make steps toward contact with Father without jeopardizing his mental health and there is no guarantee that he can do so in the future. In [Ms.] Holoviak's opinion, there would be no detriment to [Child] if Father's parental rights were terminated; rather, it would be beneficial to [Child] because the alternative, pursuing a relationship with Father, would be more likely to exacerbate [Child's] symptoms.

> The Agency cannot begin to pursue permanency for [Child] in his current state of instability. The evidence demonstrates that there are no foster families at this time willing to have [Child] in their homes. Mother is not a viable option at the time for several reasons; however, return to Mother's home cannot be considered unless or until the child is mentally and emotionally stable. It is in [Child's] best interest that the most significant impediment to safety and stability as identified by mental health professionals, Father, be removed from [Child's] life.
>
> We are not blind to the fact that this father had repeatedly expressed his desire to be part of his son's life and that Father's opportunity to have a relationship with [Child] was alleged to have been sabotaged by Mother's actions. However, it is the child's best interest that are this [c]ourt's paramount concern, and not Father's. Accordingly, we are constrained to find that this extraordinary and unusual step is required [to] give [Child] a chance at a safe, stable future.

OCO at 29-30. Father does not challenge the court's findings with respect to section 2511(b).

As there is competent evidence in the record that supports the orphans' court's credibility and weight assessments regarding Child's needs and welfare, and the absence of any bond with Father, we conclude that the court did not abuse its discretion as to section 2511(b). *See S.P.*, 47 A.3d at 826-27. Accordingly, we affirm the decree terminating Father's parental rights to Child.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>01/17/2018</u>